UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
PAUL WEATHER,

                        Plaintiff,

                                                08 Civ. 192 (RPP)

            - against -

                                                **OPINION AND ORDER**

THE CITY OF MOUNT VERNON and
SERGEANT MICHAEL MARCUCILLI,

                        Defendants.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.,**

        On February 17, 2011, the jury found for Plaintiff on his claim of excessive force

against Defendant Sergeant Marcucilli and the City of Mount Vernon.  The jury awarded

a total of $315,000 in damages to Mr. Weather: $90,000 in compensatory damages,

$200,000 in future damages, and $25,000 in punitive damages.  On March 1, Defendants

filed a brief contending that Sergeant Marcucilli is entitled to qualified immunity.

Plaintiff filed a brief in opposition on March 4.  For the reasons stated below, the Court

finds that Sergeant Marcucilli is not entitled to qualified immunity.

## BACKGROUND

        Trial in this matter began on February 14, 2011.  Plaintiff called as witnesses Dr.

Sergei DeLaMora, Dr. Satish Modugu, and Matthew Mariani to testify as to Mr.

Weather's injuries and damages.  Defendants called Dr. Martin Barschi as a direct

witness to testify as to damages.  As to liability, Plaintiff's witnesses included Mr.

Weather himself; Janee Weather, the Plaintiff's daughter; James Young, a school security

guard; and Police Officer Alissa Rhodes.  Defendants called Deputy Police Chief John

Roland, Police Officer Dennis Kelly, and Defendant Sergeant Marcucilli.  Because

Sergeant Marcucilli's entitlement to qualified immunity turns on his conduct and the circumstances he confronted during the incident in question, the trial testimony regarding those issues is briefly summarized below.

I. Testimony of Plaintiff Paul Weather

Plaintiff Paul Weather is a police officer and longtime resident of Mount Vernon, who is on disability retirement (Trial Tr. ("Tr.") at 94-95.)  He became employed as an officer by the City of Mount Vernon in 1988, where he worked until 1992.  (Id. at 95.)  In 1992, he became a Westchester County Police Officer, and was subsequently promoted to detective.  (Id.)  Mr. Weather retired from the Westchester County police force in February 2005, due to a spinal injury he had sustained in 2003.  (Id.)

Plaintiff's claim arose out of an incident a high school basketball game in Mount Vernon on January 12, 2007.  (Id. at 151.)  At approximately four o'clock that day, Mr. Weather arrived at Mount Vernon High School to watch the basketball game with his son.  (Id. at 151-152.)  Just before half time, while he was seated in the gymnasium, he received a phone call on his cell phone from his daughter, Janee Weather, who asked him to come outside and speak with her.  (Id. at 154.)  Mr. Weather told her that he would go outside at halftime.  (Id.)  A few minutes later, he left the gym, and entered the hallway that led to the entrance to the school, where there is a row of glass doors leading outside. (Id.)  On his way to the doors, he approached a High School Security Officer, James Young, and explained that his daughter had called and that he was going to go outside to speak with her.  (Id. at 155.)  Mr. Weather testified that he spoke to Mr. Young because he saw many police officers outside the entrance, and wanted to be sure that he could get back in.  (Id.)

As Plaintiff approached the glass doors that led outside, he saw one police officer standing to the left side of the doors and one to the right side.  (Id.)  He approached the officer standing at the left side of the doors, and explained "I am going to go outside to see my daughter.  I am a retired detective but I left my identification inside."  (Id. at 162.)  He could tell that the officer did not recognize him.  (Id.)  Through the glass doors, he saw five or six additional officers standing by the entrance, and he could see his daughter beyond them as well as a group of kids.  (Id. at 162-163.)  He then said to the officer standing at the doors, "Call over your sergeant, he may recognize me."  (Id. at 163.)  Plaintiff then opened the door with his left arm, and Sergeant Marcucilli approached him.  (Id. at 164-165.)  The officer with whom Plaintiff had been speaking explained to the Sergeant, "Sarge, he says he's a retired county detective, but he left his ID inside."  (Id. at 165.)

Sergeant Marcucilli then grabbed Plaintiff's wrist, "popped the arm and the elbow" and stepped toward him.  (Id. at 165-166.)  Plaintiff protested, "Let me go, my arm, my arm."  (Id. at 166.)  Plaintiff was bent forward with his left arm bent behind his back and held there by Sergeant Marcucilli.  (Id.)  Then, Sergeant Marcucilli "tossed" Plaintiff into the brick wall next to the door, near a telephone.  (Id. at 166-167.)  The right side of Plaintiff's body hit the wall.  (Id. at 167.)  Plaintiff testified that when he straightened up after hitting the wall, Sergeant Marcucilli was "here in my face, and he's like this 'Shut up' and he's poking me in the chest…with his stiff hand."  (Id. at 167.)

Next, Phil Chimes, a sports announcer who Mr. Weather knew, approached Plaintiff and Sergeant Marcucilli and said "Paul, what's going on?"  (Id. at 169.)  At that time, Sergeant Marcucilli released Plaintiff.  (Id.)  Then, Mr. Chimes told Mr. Weather to

get his daughter and go back into the game with him.  (Id.)  Mr. Weather and his daughter walked into the school, at which time Mr. Weather's son approached him holding his wallet, shield and ID.  (Id.)  As he reentered the building, Mr. Weather explained to the police officer standing to the right of the glass doors door that he was a retired detective and showed his ID.  (Id.)  Then he reentered the gymnasium and walked toward where the mayor of the city of Mount Vernon and Judge John DiBlasi were sitting.  (Id. at 169-170.)  Mr. Weather told the Mayor, "Mayor, I've just been assaulted by a cop outside."  (Id. at 170.)  Judge DiBlasi then jumped up and said "Paul, let's go." (Id.)  The Mayor said "No, hold on, Call over [Police Commissioner] Chong" (Id.)  When Commissioner Chong approached the Mayor, the Mayor instructed him to "Go outside and see what's going on."  (Id.)

Commissioner Chong and Plaintiff then walked out of the gymnasium to the hallway of the school, and approached the glass doors at the entrance.  (Id.) Commissioner Chong then asked Mr. Weather to point out the police officer who had assaulted him.  (Id.)  Mr. Weather stayed inside the glass doors and pointed out Sergeant Marcucilli.  (Id.)  Commissioner Chong then went outside and returned a few minutes later.  (Id.)  Upon his return, he told Mr. Weather "Don't worry about it, I'll take care of it."  (Id.)  Mr. Weather then returned to the gymnasium, and called his wife and asked her to come get him and take him to the hospital.  (Id. at 171.)  Mr. Weather spent about an hour at the hospital, where he received a Demerol injection.  (Id. at 174.)

As a result of this incident, Plaintiff, who had prior injuries, sustained a fractured clavicle, injury to his right rotator cuff and aggravation of injury to his left rotator cuff. Two doctors and an occupational therapist who treated Mr. Weather testified with regard

to the extent of these injuries.  (Id. at 38-43; 122-123; 136-143.) Mr. Weather testified

that he now has continuing pain and considerable trouble sleeping.  (Id. at 179-80.)

On cross-examination, Plaintiff testified that when he opened the door to exit the

school, he opened the door completely to a 90 degree angle.  (Id. at 189-190.)  He

admitted that Sergeant Marcucilli did not apply a choke hold to him during their

encounter.  (Id. at 200.)  He further testified that he told the officer at the door of the

school that he was a retired Westchester County Police Officer, but acknowledged that it

was possible he had said he was a former Mount Vernon Detective.  (Id. at 201, 203.)

Mr. Weather also testified on cross-examination that he remembered Sergeant Marcucilli

"trying to knock my hat off my head…with his hand he was—hitting me in the chest and

trying to knock the hat off my head."  (Id. at 203.)

## II.  Testimony of Janee Weather

Plaintiff's daughter, Janee Weather, testified that while she stood outside the

entrance of the high school on January 12, 2007, she called her father and requested that

he come outside to speak with him.  (Id. at 77.)  Approximately five minutes after this

call, she saw her father inside the school, beyond its glass doors.  (Id.)  At the time she

saw Mr. Weather, she was standing outside, about two feet away from the doorway.  (Id.)

She saw her father speak to one or two people as he walked toward the doors to exit the

building.  (Id. at 78.) She testified that then she saw her "dad open[] the door…with his

arm.  And next thing you know, an officer is approaching him while he's holding the

door and pulls him outside of the building."  (Id.)  She testified that Mr. Weather's arm

was grabbed "behind his back," and that he was then pushed up against one of the brick

walls next to the door to the school.  (Id. at 79.)  She then saw the officer who had

grabbed Mr. Weather "prod…in [Plaintiff's] chest with his four fingers," and heard the Officer "telling [Plaintiff] to shut up." (Id. at 80.) She did not hear her father raise his voice or see him move his arms, but she did hear him say "what are you doing to me?" to the officer. (Id.) She testified that this encounter ended when "someone came out of the building and broke it up." (Id.) She also testified that at the time of this incident there were about 25-30 people standing outside of the school. (Id. at 81.)

On cross-examination, Jenee Weather testified that when she arrived at the school that afternoon, all of the doors to the school were closed. (Id. at 86.)

III. <u>Testimony of James Young</u>

James Young is employed as a security officer by the Mount Vernon School District. (Id. at 222, 227.) Mr. Young testified that near half-time at the basketball game on January 12, he was standing near the entrance to the school when Mr. Weather approached him and explained that he had to see his daughter and asked to step outside. (Id. at 223-224.) Mr. Young then turned to the police officer on his left in order to get the officer's attention, so that the officer could identify Mr. Weather and let him back in the game when he returned. (Id. at 224.) At that time, the gym was full and people were no longer being admitted to the game. (Id.) Mr. Young told the officers outside the door that Mr. Weather "was OK, he can come back in," and he saw Mr. Weather go to the door to exit the building. (Id. at 225-26.) Then, Mr. Young

> "turned to just check the concession stand because it was half time. Mr. Weather was proceeding toward the door. When I turned back around, I saw several officers surrounding Mr. Weather, so I begin to move toward the door, and they had shoved him into the wall and he kind of went down…At that time I got to the door and then when I opened the door, I heard Mr. Paul Weather say, "Guys, I'm an ex-detective." As they were bringing him back up, one of the police officers said, "I don't give a damn or—who you are" and just flicked his hat off. At that point in time I

> yelled out to them and said "Hey, hey guys.  He's all right.  You know, we
> let him out.  He's all right.  Let him go."  They didn't pay me any mind so
> I ran inside the door to the gym to try to get some more assistance."

(Id. at 226.)

Mr. Young further testified that Mr. Weather did not appear to be intoxicated or under the influence of narcotic drugs, and that he didn't yell or make any threatening gestures during his encounter with the police.  (Id. at 227.)

On cross-examination Mr. Young testified that during the event, the glass doors at the entrance of the school were to be used to enter the building, while there was a separate door to be used to exit the game.  (Id. at 230-31.)  Mr. Weather exited from the glass doors.  (Id. at232.)  Mr. Young also testified that there was "a great amount of people," people outside the school when he saw Mr. Weather outside.  (Id. at 234.)  Mr. Young explained that the glass doors were locked from the inside at that point in the evening, so that individuals could exit via those doors, but not enter from the outside. (Id. at 235.)

IV. <u>Testimony of Detective Alissa Rhodes</u>

Detective Alissa Rhodes testified that she became aware of an incident between Mr. Weather and Sergeant Marcucilli during half time at the game on January 12.  (Id. at 237-38.)  Detective Rhodes was inside the gym when Mr. Weather's son came up to her and said "My Dad needs you outside."  (Id. at 240.)  Detective Rhodes then followed Mr. Weather's son out of the gym and into the hallway, toward the glass doors at the entrance of the school.  (Id. at 240-241.) Upon exiting the building, she observed Mr. Weather and Sergeant Marcucilli arguing.  (Id. at 241.)  "They were pretty much in each other's faces. Sergeant Marcucilli had his fingers in Mr. Weather's face and flicked his hat with his

finger." (Id. at 241-42.) She heard the Sergeant say something to the effect that Mr. Weather "could get arrested for this." (Id.) When she saw the two men talking, Mr. Weather's back was facing the brick wall. (Id.) She then told Sergeant Marcucilli that she knew Mr. Weather, that Mr. Weather was a friend of her father's, and that Mr. Weather used to work for Mount Vernon as a detective. (Id. at 243.)

On cross-examination, Detective Rhodes testified that when she went outside the school, there was a crowd of "over 50" people outside. (Id. at 246.) She also explained that after she spoke to Sergeant Marcucilli she then returned to the gym. (Id. at 249.)

### V. Testimony of Deputy Chief John Roland

Deputy Chief John Roland testified that he was in charge of security at Mount Vernon High School on the day of the incident. (Id. at 257-258.) He recalled seeing Mr. Weather at half time, when Mr. Weather re-entered the gym and approached the Mayor of Mount Vernon and spoke with the Mayor and Police Commissioner Chong. (Id. at 259.) He did not recall the details of any conversation between them. (Id.) Deputy Chief Roland further testified that when a game at the school is filled to capacity, the glass doors at the entrance to the school are shut and no one is allowed to enter. (Id. at 260.)

### VI. Testimony of Police Officer Daniel Kelly

Police Officer Daniel Kelly testified that his role at the game that evening was to guard the glass doors at the entrance of the school. (Id. at 261.) Officer Kelly testified that he first saw Mr. Weather when Mr. Weather was trying to gain access to the school during the basketball game. (Id. at 261-262.) He then heard Police Officer Budde call to him and Sergeant Marcucilli. (Id. at 262.) The officers then approached Mr. Weather, who was near Officer Budde, and was speaking in a slightly loud voice, saying that he

was a Mount Vernon Detective.  (Id. at 263.)  The officers told Mr. Weather that he was not a Mount Vernon Detective, but Officer Kelly recalled him saying that he was a detective five times.  (Id.)  Mr. Weather did not show any identification.  (Id.)  Officer Kelly testified that during this encounter Mr. Weather was "tending to get violent and pulling away." (Id.)

Officer Kelly explained that "we were attempting to hold him at the door so either he couldn't reach for our weapon or swing at all.  He started to pull away and his voice was louder."  (Id.)  Then, "Sergeant Marcucilli grabbed Mr. Weather's wrists (sic) and [Officer Kelly] grabbed his other arm." (Id. at 263-264.)  At this time, Mr. Weather was standing in front of the glass doors, with his back to the door.  (Id. at 264.)  The officers held him next to the brick wall, about twenty feet from the glass doors, for about ten minutes while trying to speak with Mr. Weather.  (Id.)  Then, a school security officer passed the officers and confirmed Mr. Weather's identity, and Mr. Weather was escorted inside.  (Id.)

On cross-examination, Officer Kelly testified that there were about ten or twenty people outside the entrance of the school during his encounter with Mr. Weather.  (Id. at 266.)  Officer Kelly also testified on cross-examination that he did not ask Mr. Weather if he was armed, nor did he see a bulge on Mr. Weather's body that would have indicated he was armed.  (Id. at 267.)   Officer Kelly, however, still believed that it was possible that Mr. Weather was armed because he was claiming to be a police officer.  (Id. at 268.)  Officer Kelly also testified that Mr. Weather appeared to be sober at the time of the incident.  (Id. at 269.)  Officer Kelly testified that with regard to the physical contact he made with Mr. Weather, Sergeant Marcucilli was the first to make contact, grabbing his

wrist, while Officer Kelly held his arm.  (Id. at 271.)  He was unable to testify with certainty as to whether Mr. Weather's arm was twisted behind his back, but did not recall that it was.  (Id.)  Officer Kelly testified that Mr. Weather's back was up against the brick wall at some point.  (Id. at 272.)  He further explained that Mr. Weather was not charged with any crimes or arrested that evening.  (Id.)

VII.    Testimony of Sergeant Marcucilli

Defendant Sergeant Marcucilli testified that at the time of the incident, he was stationed outside the glass doors at the entrance to Mount Vernon High School, where his role was to supervise the officers stationed outside the entrance, who were providing security for the game.  (Id. at 296-297.)  He testified that when he first encountered Mr. Weather he was standing outside, facing the parking lot, and heard someone behind him identifying himself as Mount Vernon police detective.  (Id. at 299.)  He turned and saw Mr. Weather, and stated, "I'm a Mount Vernon Police Sergeant."  (Id.)  He asked to see Mr. Weather's identification.  (Id.)    Sergeant Marcucilli testified that at that point, Mr. Weather "began to yell and scream at the top of his lungs that I was wrong."  (Id.) Sergeant Marcucilli then requested his identification again, and informed Mr. Weather that he was highly disorderly.  (Id.)  Sergeant Marcucilli testified that he then motioned Mr. Weather to the side "so that he wouldn't obstruct [the] children and people in the area."  (Id.)

At that point, Sergeant Marcucilli again requested identification, and Mr. Weather responded that he was a county police detective and his identification was inside the gym. (Id.)  Based on Mr. Weather's stating that he was a Mount Vernon police detective and then a county police detective, Sergeant Marcuilli then suspected that Mr. Weather was

"under the influence of some type of narcotic…or he was emotionally disturbed; that he didn't know who he was." (Id. at 300.) Sergeant Marcucilli testified that "I placed my left hand on his left wrist and my right hand on the left—the rear of his bicep. I did this because my concern was he appeared to be—was becoming a danger to the people in the area and myself." (Id.) A few moments later, Police Officer Rhodes approached Sergeant Marcucilli and explained that Mr. Weather was a former Mount Vernon police officer. (Id.) Sergeant Marcucilli testified that Mr. Weather continued to yell, and that he advised Mr. Weather that he would be placed under arrest for disorderly conduct. (Id.) Mr. Weather then calmed down and was allowed to enter the gym. (Id.)

Sergeant Marcucilli testified that while Mr. Weather was yelling, a crowd had started to gather. (Id.) He testified that the crowd that gathered around was yelling "fuck the po-po," and "apparently was becoming angry due to Mr. Weather's actions." (Id. at 301.) He explained that "the po-po" is "a slang term used by some members of the community," to refer to the police. (Id. at 302.) He testified that the crowd became boisterous, and that some of them were trying to pull on the doors. (Id.) Sergeant Marcucilli also testified that at one point, one door was actually pulled open. (Id.) Sergeant Marcucilli then decided to allow Mr. Weather to re-enter the game in order to "diffuse the situation." (Id.) Sergeant Marcucilli testified that to his recollection neither Officer Kelly, nor Officer Budde, who were on the scene that day, touched Mr. Weather. (Id.)

Sergeant Marcucilli then demonstrated the hold he applied to Mr. Weather, and distinguished it from what is called "wrist lock." (Id. at 303-304.) He said that the term for the maneuver he applied to Mr. Weather was a "modified arm bar," that would enable

him to control Mr. Weather. (Id. at 304.) He testified that he never put Mr. Weather's arm behind his back, applied any pressure to Mr. Weather, or hit Mr. Weather's head into a wall. (Id. at 304.)

On cross-examination, Sergeant Marcucilli testified that he only had his hands on Mr. Weather for about ten seconds. (Id. at 310.) Sergeant Marcucilli was cross-examined as to whether he had ever been accused of using excessive force other than in conjunction with this incident, and acknowledged that "he only knows of rumor and innuendo." (Id. at 314.) Sergeant Marcucilli also stated that he was disciplined by the police department twice, for a minor fender bender in his police car and for smoking a cigarette in uniform. (Id. at 315.) He also acknowledged that as a result of an internal police investigation, his weapon had been taken away from him by the Mount Vernon Police Department, and that he had been taken off the street and put on "light duty." (Id. at 315-16.)

VIII.  Verdict

Defendant moved for a directed verdict at the close of Plaintiff's case. (Id. at 254.) In view of the significant issues of fact regarding the conduct of the officers and the circumstances surrounding the incident, the Court denied the motion, and instead followed the procedure set forth by the Second Circuit in Stephenson v. Doe, 332 F.3d 68 (2d Cir. 2003). Stephenson similarly involved excessive force claims under the Fourth Amendment. In that decision, the Court called into question the propriety of submitting qualified immunity to the jury, due to the difficulty in asking a jury to make a legal determination regarding the reasonableness of the Defendant Marcucilli's conduct under well established law. Id. at 80 n.16. Instead, the Court suggested that the use of special

interrogatories "resolves the difficulty of requiring the jury to decide 'what the facts were that the officer faced or perceived,'" so that "the court [can] make the ultimate legal determination of whether qualified immunity attaches on those facts." Id. at 81.

In this case, the Court, after receiving proposed interrogatories from the Defendant and with the consent of both parties, submitted the following special interrogatories to the jury as part of the verdict sheet and received the following responses:

1.      Did defendant prove, by a preponderance of the evidence, that Sergeant Marcucilli saw, or was told, that plaintiff was attempting to enter the locked doors to the school?

No

2.      Did defendant prove, by a preponderance of the evidence, that Sergeant Marcucilli heard, or was told, that plaintiff claimed he was an active Mount Vernon Police Officer?

No

3.      Did defendant prove, by a preponderance of the evidence, that a reasonable police officer facing the circumstances confronting Sergeant Marcucilli would have believed that he had sufficient grounds to remove plaintiff from the area and direct him toward the wall, without making further inquiry?

Yes

4.      Did defendant prove, by a preponderance of the evidence, that Sergeant Marcucilli's actions towards plaintiff were reasonable because there was a crowd surrounding Mr. Weather and the crowd was chanting "fuck the police"?

No

5.      Did defendant prove, by a preponderance of the evidence, that Sergeant Marcucilli did not twist plaintiff's arm behind plaintiff's back?

No

5.A.    Did defendant prove, by a preponderance of the evidence, that a reasonable police officer facing the circumstances confronting Sergeant Marcucilli would have twisted plaintiff's arm behind plaintiff's back?

No

6.    Did defendant prove, by a preponderance of the evidence, that Sergeant Marcucilli did not shove or push plaintiff forcefully into the brick wall outside the school's entrance?

No

6.A.    Did defendant prove, by a preponderance of the evidence, that a reasonable police  officer facing the circumstances confronting Sergeant Marcucilli would have shoved or pushed plaintiff forcefully into the brick wall outside the school's entrance?

No

## DISCUSSION

"Under the doctrine of qualified immunity, 'government officers performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known…'" Kelsey v. County of Schoharie, 567 F.3d 54, 60-61 (2d Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity is an affirmative defense. The burden rests on the defendants to raise the defense in their answer and to establish the defense on a motion for summary judgment or at trial." Lee v. Sandberg, 136 F.3d 94, 101 (2d Cir. 1997).

When a defendant invokes qualified immunity as a defense, a court must consider two questions:  "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the

official's conduct violated a clearly established constitutional right." <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815, 555 U.S. 223 (2009) (internal citations omitted).  The relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier v. Katz</u>, 533 U.S. 194, 202, 121 S.Ct. 2151(2001).  In other words, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." <u>Id.</u> (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

Here, by finding Plaintiff had proved that Sergeant Marcucilli liable on the excessive force claim, the jury found that Sergeant Marcucilli's use of force was unreasonable in light of the circumstances he faced, and violated Plaintiff's Fourth Amendment rights.  In excessive force cases the qualified immunity and Fourth Amendment analyses often "converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." <u>Cowan v. Breen</u>, 352 F.3d 756, 764 n.7 (2d Cir.2003) (citation omitted). <u>See</u> <u>also</u> <u>Roy v. Inhabitants of Lewiston</u>, 42 F.3d 691, 695 (1st Cir. 1994) (noting that because both the Fourth Amendment excessive force standard and the qualified immunity standard depend upon whether the officer's conduct was objectively reasonable, the outcome likely would have been the same even if an immunity defense had not been raised).  Nevertheless , the Second Circuit still requires the court to apply the multi-step analysis of <u>Saucier</u>, as modified by <u>Pearson</u>, 129 S. Ct. at 820.  <u>Cowan</u>, 352 F.3d at 764 n.7.

The first element of the <u>Pearson</u> test, namely the existence of a constitutional violation, was established by the jury verdict in this case imposing liability of Sergeant

Marcucilli for his use of excessive force against Mr. Weather.  The remaining task for the Court is to determine whether the right the jury found to have been violated by was "clearly established," Pearson, 129 S. Ct. at 815, and whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.   If the right was not clearly established, the defendant is not liable even if his actions did violate a plaintiff's constitutional rights. See Saucier, 533 U.S. at 206, 121 S.Ct. 2151.  Green v. City of New York, 465 F.3d 65, 82 (2d Cir. 2006).  An officer will also be granted qualified immunity if he makes a reasonable mistake as to what the law requires.  Saucier, 533 U.S. at 205.

It is well established that "the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier v. Katz, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  The reasonableness of the application of force applied by a police officer depends on a balancing of the force applied and the circumstances confronted by the officer.   "A claim that excessive force was used in the course of a seizure is subject to an objective test of reasonableness under the totality of the circumstances of each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others, and whether he is actively resisting arrest."  Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000) (citing Graham v. Connor, 490 U.S. at 395-396).   Under the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required.  Bauer v. Norris, 713 F.2d 408, 412 (8th Cir. 1983) ("the use of any force by officers simply because a suspect is argumentative, contentious, or

vituperative is not to be condoned") (internal quotations omitted). The Second Circuit has held that the degree of injury is not determinative of an excessive force claim; even an injury that is not permanent or severe can suffice. Robinson v. Via, 821 F.2d 913, 924 (2d Cir. 1987).

It was clearly established at the time of this incident that a police officer could not lawfully apply a degree of force to an individual that was unreasonable in light of the totality of the circumstances. Saucier, 533 U.S. at 201-02. In view of the jury's finding that Sergeant Marcucilli's use of force during this incident was unreasonable in light of the totality of the circumstances, Sergeant Marcucilli violated clearly established law, and is not protected by qualified immunity. Id. at 205. No evidence was presented at trial to suggest that Sergeant Marcucilli made a mistake regarding his legal obligations such that would excuse his actions. This case turned on the facts of Sergeant Marcucilli's conduct and the surrounding circumstances.

In support of their application for qualified immunity, Defendants cite a number of cases that they claim establish that the actions taken by Sergeant Marcucilli were objectively reasonable. None of these cases turn on facts similar to those presented by this case and, by way of comparison, they serve to further demonstrate why Sergeant Marcucilli is ineligible for qualified immunity.[1]

In Crowell v. Kirkpatrick, 09-4900 Civ., 2010 WL 4595545 (2d Cir. Nov. 15, 2010), protestors who had chained themselves to a hundred-pound barrel drum were

---

[1] In addition to the cases discussed, Defendant cites Gashi v. County of Westchester, 02 Civ. 6934, 2007 WL 749684 (S.D.N.Y. 2007) and Davidson v. Murray, 371 F.Supp.2d 361, 375-76 (W.D.N.Y. 2005). These cases involve claims of cruel and unusual punishment under the Eighth Amendment, and thus apply an entirely different legal framework from that applicable under the Fourth Amendment.

tased by police after they resisted arrest.  Id. at *2.  Prior to tasing the plaintiffs, the police attempted a number of less forceful methods of removing them from the drum, using the taser only as a last resort.  Id.  Also, the plaintiffs were warned and given opportunities to release themselves from the drum prior to being tased.  Id.  In contrast, the evidence presented at trial did not demonstrate that Mr. Weather was given any opportunity to comply with a directive of the police before Sergeant Marcucilli twisted his arm behind his back and shoved him against the wall.  There was no evidence that Sergeant Marcucilli attempted any other methods of stopping or subduing Plaintiff before the application of force, or that force was applied only as a last resort.  There was no evidence demonstrating that Plaintiff was actively resisting arrest.  Thus, while the conduct in Crowell may have passed constitutional muster, the factual distinctions between Crowell and the case here demonstrate why qualified immunity does not shield Sergeant Marcucilli from liability.

In Li v. Aponte, No. 05 Civ. 6237, 2008 WL 4308127 (S.D.N.Y.  Sept. 16, 2008), the court denied the government's motion for summary judgment of plaintiff's excessive force claim on qualified immunity grounds.  It found that it could not say as a matter of law that the defendant's use of force was not excessive and therefore subject to qualified immunity.  Id.  at *9.  Plaintiff Li claimed that she was assaulted by a police officer after walking into a post office with her dog, despite the fact that "she posed no threat to Aponte or anyone else, did not attempt to flee…and offered only passive resistance" to arrest.  Id. at *10.  The court explained that a law enforcement officer's "repeatedly pushing Li into walls and columns of the post office, dragging her to the ground, and pinning her there with his knee" in light of the lack of threat posed "might well be found

to be unreasonable by a jury." Id. Of course here, the conduct of Sergeant Marcucilli was in fact found to be unreasonable by a jury. In light of Li's procedural posture on summary judgment, it offers no support for Plaintiff's position that Sergeant Marcucilli's conduct, having been found to be objectively unreasonable by a jury, could have been seen by a reasonable police officer as a lawful under clearly established law.

The jury's responses to the special interrogatories in this case foreclose the possibility that a reasonable police officer in the circumstances facing Sergeant Marcucilli would have believed that the use of force at issue was reasonable under the governing law. The jury's answers to the special interrogatories found that Defendants did not establish that he did not twist Plaintiff's arm behind his back, nor did Defendants establish that Sergeant Marcucilli did not push or shove Plaintiff into the brick wall. The jury found that Defendants did not establish that Mr. Weather was trying to enter the school or claimed to be an active Mr. Vernon police officer. The jury did not find that Sergeant Marcucilli's actions of twisting Mr. Weather's arm behind his back and shoving him into the wall were reasonable in light of the crowd chanting "fuck the po-po," about which Sergeant Marcucilli had testified. Moreover, by issuing their verdict, the jury found that Sergeant Marcucilli's conduct was objectively unreasonable under the circumstances facing him at the time.

Taking the facts as they were found by the jury, this Court finds that a reasonable police officer in Sergeant Marcucilli's shoes would have been aware that his conduct, namely twisting Mr. Weather's arm behind his back and pushing or shoving him into the brick wall outside the school when Mr. Weather was not committing a crime or resisting

arrest, was unlawful. Thus, Sergeant Marcucilli is not entitled to qualified immunity for his actions.

## CONCLUSION

The jury found Defendant Marcucilli liable on Plaintiff's claim, indicating that they necessarily found his conduct to be unreasonable in view of the circumstances confronting him at the time of the incident. The law protecting individuals from excessive force applied by state actors is clearly established, and there is no authority to indicate that a reasonable officer facing the circumstances confronting Sergeant Marcucilli would have believed his actions to be a lawful response to Mr. Weather's conduct. Accordingly Sergeant Marcucilli is not eligible for qualified immunity.

IT IS SO ORDERED.

Dated: New York, New York
     March 22, 2011

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Order faxed to:**

*Counsel for Plaintiff:*

Francis Xavier Young
Young and Bartlett, LLP,
81 Main St.
White Plains, NY 10601
(914) 285-1500
Fax: 914- 285-0055

*Counsel for Defendants:*

Hina Sherwani
City of Mt. Vernon- Corporation Counsel
1 Roosevelt Square

Rm. 111
Mt. Vernon, NY 10550
(914) 665-2374
Fax: 914-665-9142